**SECOND DIVISION
BARNES, P. J.,
BOGGS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**June 28, 2016**

# In the Court of Appeals of Georgia

A16A0711. SMITH et al. v. NORFOLK SOUTHERN RAILWAY
   COMPANY.

BARNES, Presiding Judge.

This appeal arises out of a fatal collision between a freight train and a pickup truck at a railroad crossing. Before the collision between the train and pickup truck, the truck was involved in an motor vehicle accident with another car and had come to rest on the railroad tracks as a result. A passenger in the truck subsequently was killed when the train owned by Norfolk Southern Railway Company entered the crossing and struck the truck. The plaintiffs, who are the children of the deceased truck passenger,[1] filed this wrongful death action against Norfolk Southern, asserting claims for negligence per se and ordinary negligence on the ground that the train engineer allegedly had failed to blow the train's horn upon approaching the railroad crossing in the manner required by a federal railroad regulation and the standard of

---

[1] The plaintiffs are Santino Smith and Nicole Lungaro.

ordinary care. Norfolk Southern answered, denying liability on the alleged grounds that its engineer's actions were reasonable in light of the sudden emergency that had transpired and were not the proximate cause of the truck passenger's death. The case was tried before a jury, which returned a verdict in favor of Norfolk Southern.

On appeal from the final judgment entered on the verdict, the plaintiffs contend that the trial court erred by charging the jury on the defense of sudden emergency for several reasons. The plaintiffs first contend that the evidence did not support the charge on sudden emergency. The plaintiffs also contend that a charge on the sudden emergency defense was improper because the defense was preempted by a federal railroad regulation. Furthermore, the plaintiffs contend that even if a sudden emergency charge was proper, the charge as given by the trial court was an incomplete statement of the defense. Lastly, the plaintiffs contend that a separate, introductory portion of the jury charge also contained an erroneous definition of the sudden emergency defense.

For the reasons discussed below, we conclude that there was evidence to support a charge on the defense of sudden emergency. As to the plaintiffs' remaining challenges to the jury charge, we conclude that the plaintiffs waived those challenges by failing to raise them in the trial court and have failed to show that any defect in the

2

charge rose to the level of substantial error. We therefore affirm the judgment entered in favor of Norfolk Southern.

"On appeal, the evidence is construed most strongly to support the verdict and judgment." *Tice v. Cole*, 246 Ga. App. 135, 135 (537 SE2d 713) (2000). So construed, the evidence shows that the sequence of events giving rise to this litigation began at the intersection of Buford Highway and Amwiler Road in Gwinnett County. Amwiler Road crosses over three railroad tracks near the intersection.

On the late afternoon of March 12, 2013, Tony Lungaro was a passenger in a pickup truck traveling southbound on Buford Highway towards the intersection with Amwiler Road. The driver of the truck was Lungaro's employee, Lorenzo Wilkerson. As the truck approached where Buford Highway intersects with Amwiler Road, the traffic light for Buford Highway turned yellow. According to an eyewitness, Wilkerson did not stop or slow down the truck. As the light turned red, Wilkerson drove the truck into the intersection and collided with a van traveling northbound on Buford Highway that was in the process of making a left turn onto Amwiler Road.

The impact of the collision knocked both vehicles off course. The van came to rest on a grassy area near Buford Highway. The pickup truck was propelled approximately 90 feet onto one of the railroad tracks that crossed Amwiler Road.

After the truck came to rest on the railroad tracks, the crossing gates closed, and the lights and bells at the crossing activated. Other drivers began to honk their horns and to yell at the occupants of the truck to call their attention to the crossing signals.

The crossing signals activated because a freight train was traveling northbound from Atlanta to South Carolina and was approaching the crossing at Amwiler Road. The train was operated by an experienced Norfolk Southern locomotive engineer familiar with the train route. The train had 3 engine cars and 75 freight cars, was approximately 1 mile long, weighed 8,900 tons, and included several cars that carried hazardous materials. The train was traveling within the speed limit at 48 mph as it approached the crossing at Amwiler Road.

A regulation issued by the Federal Railroad Administration requires that the horn on the lead locomotive of a train be blown at least 15 seconds before the train enters a public-highway railroad crossing. 49 CFR § 222.21 (a), (b) (2).[2] The horn

[2] 49 CFR § 222.21 provides in relevant part:
(a) Except as provided in this part, the locomotive horn on the lead locomotive of a train, lite locomotive consist, individual locomotive or lead cab car shall be sounded when such locomotive or lead cab car is approaching a public highway-rail grade crossing. Sounding of the locomotive horn with two long blasts, one short blast and one long blast shall be initiated at a location so as to be in accordance with paragraph (b) of this section and shall be repeated or prolonged until the locomotive occupies the crossing. This pattern may be varied as

4

must be blown in the sequence of two long blasts, one short blast, and one long blast, with the sequence repeated or prolonged until the locomotive occupies the crossing. See 49 CFR § 222.21 (a). Norfolk Southern's internal operating rules are consistent with the federal railroad regulation.

Pursuant to the federal railroad regulation and Norfolk Southern's internal operating rules, the locomotive engineer began the first long blast of the horn before arriving at the Amwiler Road crossing. The engine bell, which also alerts others to the approach of the train, turned on automatically during the first horn blow and remained on throughout the incident at issue. The headlight and two "ditch lights" on the front of the train were activated as well.

---

necessary where crossings are spaced closely together.

(b) (1) . . . .

(2) Except as provided in paragraphs (b)(3) and (d) of this section, or when the locomotive horn is defective and the locomotive is being moved for repair consistent with section 229.9 of this chapter, the locomotive horn shall begin to be sounded at least 15 seconds, but no more than 20 seconds, before the locomotive enters the crossing. It shall not constitute a violation of this section if, acting in good faith, a locomotive engineer begins sounding the locomotive horn not more than 25 seconds before the locomotive enters the crossing, if the locomotive engineer is unable to precisely estimate the time of arrival of the train at the crossing for whatever reason.

During the first horn blow, the engineer "saw something come across the crossing and kind of make a sudden stop right on . . . [the] track." Upon realizing that it was a stationary vehicle, the engineer stopped blowing the horn and carried out a sequence of emergency steps aimed at stopping or slowing down the train. According to the engineer, "it was either blow the horn or put the train in emergency. And I put the train in emergency." The engineer put the train into emergency because the truck was "not going to move" from the track and he was concerned about a possible derailment, which would have been a "catastrophe" in light of the hazardous materials on board. The engineer moved the throttle to the idle position and sequentially applied four different train brakes, causing him to be "jostled around a little bit" inside the lead engine car and to be "shook up in [his] seat." The engineer "got back . . . onto the horn as quick as . . . [he] could" and resumed blowing the horn shortly before arriving at the Amwiler Road crossing.

The engineer was able to slow the train down, but not to stop it. As the train approached the crossing, the pickup truck remained on the tracks facing in the direction of the oncoming train. Wilkerson, the driver of the pickup truck, was slumped over in the driver's seat and did not respond to the approaching train. Lungaro exited from the passenger side of the truck and remained standing there,

6

facing the opposite direction from which the train was approaching. According to an eyewitness, Lungaro appeared to be in a "daze" and "just kept standing there like he was trying to figure out what was going on." As the train blew its horn for the second time, Lungaro "turned to run, but it was too late." The train hit the pickup truck, and the truck hit Lungaro and killed him. Wilkerson was severely injured but survived the impact from the train. The train did not derail, and the locomotive engineer was not injured. It took the engineer a half mile to bring the train to a complete stop on the tracks.

Video from a camera mounted in the train showed that approximately 22 seconds elapsed from the time the pickup truck came to a rest on the railroad tracks until the impact with the train. The video also recorded when the engineer was blowing the horn on the train. The video reflected that the engineer first sounded the horn for 4 seconds, starting 22 seconds before the collision and ending 18 seconds before the collision. The engineer blew the horn a second time approximately 2 seconds before the train hit the truck. During the approximately 16-second gap between the first and second horn blast, the engineer applied the four different train brakes as part of the emergency procedure aimed at stopping or slowing down the train.

Following the collision, the plaintiffs sued Norfolk Southern for the wrongful death of their father, Lungaro.[3] The plaintiffs alleged that Norfolk Southern was liable under theories of negligence per se and ordinary negligence based on the 16-second gap between the first and second horn blast sounded by the locomotive engineer as the train approached the railroad crossing. According to the plaintiffs, the engineer had failed to continuously blow the horn in the manner prescribed by 49 CFR § 222.21, the railroad's internal operating rules, and the standard of ordinary care, and thus had failed to properly warn Lungaro of the approaching train. The plaintiffs asserted that if the train horn had been properly sounded, it would have alerted Lungaro to the train and would have caused him to flee from the tracks for his own safety.

Norfolk Southern answered, denying liability. Norfolk Southern alleged that the locomotive engineer's decision to apply the four brakes to slow the train rather than continuously blow the horn was reasonable in light of the sudden emergency that had transpired. Norfolk Southern further alleged that the actions of the engineer were not the proximate cause of Lungaro's death, and that the true proximate cause was the

---

[3] The plaintiffs also sued the driver of the van that collided with the pickup truck, but they settled with him before trial.

negligence of the drivers of the pickup truck and van involved in the motor vehicle accident.

A jury trial ensued over several days in August 2015. Following the close of evidence, the trial court charged the jury on, among other things, Norfolk Southern's defense of sudden emergency. The plaintiffs objected on the ground that the evidence did not support a charge on sudden emergency and that the charge had the effect of granting "immunity" to Norfolk Southern.

The jury subsequently returned a verdict in favor of Norfolk Southern. The verdict form differentiated between the plaintiffs' claim for negligence per se based on the alleged violation of 49 CFR § 222.21 and their claim for ordinary negligence. With respect to the negligence per se claim, the jury found that the plaintiffs had not proven by a preponderance of the evidence that Norfolk Southern "violated 49 CFR § 222.21 and that such violation was a proximate cause of Tony Lungaro's death." With respect to the ordinary negligence claim, the jury found the plaintiffs had not proven by a preponderance of the evidence that Norfolk Southern "was in any other way negligent and that such negligence was a proximate cause of the injuries to . . . [Lungaro]." The trial court thereafter entered judgment on the jury verdict in favor of Norfolk Southern, resulting in this appeal by the plaintiffs.

1. As previously noted, Norfolk Southern argued at trial that the locomotive engineer's decision to implement emergency braking procedures rather than continuously blow the train horn was reasonable in light of the sudden emergency posed by the disabled pickup truck, and the trial court charged the jury on the defense of sudden emergency. On appeal, the plaintiffs first contend that the trial court erred by charging the jury on the defense of sudden emergency because there was no evidence to support such a defense. According to the plaintiffs, there was no evidence that the engineer was faced with a choice between blowing the horn and applying the emergency braking procedures without time for deliberation or thought, and thus the sudden emergency defense had not application. We disagree.

It is well established that if a defendant "is confronted with a sudden emergency without sufficient time to determine with certainty the best course to pursue, he is not held to the same accuracy of judgment as would be required of him if he had time for deliberation," and the existence of the emergency can be considered by the jury in deciding whether the defendant exercised ordinary care. *Luke v. Powell*, 63 Ga. App. 795, 804 (12 SE2d 196) (1940). The sudden emergency defense

> is available where the evidence shows that there has been a sudden peril
> caused by circumstances in which the defendant did not participate and

10

which offered him a choice of conduct without time for thought; under such circumstances, negligence in his choice might be attributable not to lack of care but to lack of time to assess the situation.

*Jimenez v. Morgan Drive Away*, 238 Ga. App. 638, 641 (2) (a) (519 SE2d 722) (1999). See *Holt v. Scott*, 226 Ga. App. 812, 815 (2) (487 SE2d 657) (1997). "The defense of sudden emergency applies only to those acts that occur immediately after the apprehension of the danger or crisis," *Rayfield v. Farris*, 253 Ga. App. 167, 168 (558 SE2d 748) (2002), and the defense "requires that the person confronted by the emergency have the opportunity to exercise one of several reasonable alternative courses of action. In the absence of such factors, there can be no conduct to which to apply the standard and the . . . [defense] is inapplicable." (Citation and punctuation omitted.) *Metropolitan Atlanta Rapid Transit Auth. v. Mehretab*, 224 Ga. App. 263, 264 (1) (480 SE2d 310) (1997).

A jury charge on the sudden emergency defense is authorized if the defendant presents any evidence, however slight, to support such a defense, *Stephens v. Hypes*, 271 Ga. App. 863, 866 (610 SE2d 631) (2005), even if there is conflicting evidence that would allow the jury ultimately to find that an emergency did not exist. See *Franklin v. Hennrich*, 196 Ga. App. 372, 374-375 (2) (a) (395 SE2d 859) (1990). This

is because the ultimate issue of whether an emergency existed should be presented to and resolved by the jury "except in plain and indisputable cases." *Kelly v. Adams*, 197 Ga. App. 574, 576-577 (2) (398 SE2d 848) (1990). Whether there was slight evidence authorizing a charge on the sudden emergency doctrine is a legal question, and we review the issue de novo on appeal. See *One Bluff Drive, LLC v. K. A. P., Inc.*, 330 Ga. App. 45, 47 (1) (766 SE2d 508) (2014).

There was evidence presented at trial sufficient to support a charge on the sudden emergency defense. As an initial matter, there was evidence that the locomotive engineer was not at fault in the creation of the emergency situation, given that the pickup truck was propelled onto the railroad tracks in front of the approaching train as a result of its collision with another vehicle.

Furthermore, there was evidence that when the engineer realized the sudden peril in front of him, the circumstances offered him a choice of alternative courses of action without time for thought or for careful reflection. Specifically, the engineer testified that upon identifying that the object in front of him was a truck stopped on the tracks, he had to choose quickly between continuing to blow the horn or carrying out a sequence of emergency braking procedures aimed at stopping or slowing the train. As the engineer explained, "[I]t was either blow the horn or put the train in

emergency. And I put the train in emergency." The engineer testified that he "blew the horn the best . . . [he] could in that situation," but that "everything happened so fast," he "got jostled a little bit," and he chose to carry out the emergency braking procedures. Furthermore, the video camera mounted in the train reflected that only 22 seconds elapsed from the time the truck became disabled on the tracks until the impact with the train.

Under these circumstances, the trial court was authorized to charge the jury on the sudden emergency defense. See *Willis v. Love*, 232 Ga. App. 543, 545 (2) (a) (502 SE2d 487) (1998) (charge on sudden emergency defense was authorized in vehicle collision case, where there was evidence that the defendant driver, who came upon a wreck at an upcoming intersection without any prior warning after cresting a hill, chose to apply brake rather than attempt to pass another car). Compare *Butgereit v. Enviro-Tech Environmental Svcs.*, 262 Ga. App. 754, 757 (2) (586 SE2d 430) (2003) (evidence did not support a charge on sudden emergency defense, where defendant driver "did not contend that he had a choice between attempting to stop and taking some other action, nor did he testify that he considered any course of conduct other than braking"). And while the plaintiffs assert that there was sufficient time for careful reflection by the engineer and that the engineer could have applied the horn

13

and brake simultaneously, it was for the jury to resolve any conflicts in the evidence after being instructed on the sudden emergency defense. See *Franklin*, 196 Ga. App. at 374-375 (2) (a). Hence, there was a sufficient evidentiary basis for the trial court to charge the jury on the sudden emergency defense.

2. The plaintiffs also contend that the trial court erred by charging the jury on the defense of sudden emergency because the defense was preempted by 49 CFR § 222.21, the federal railroad regulation that specifies the manner in which a train horn must be blown at a public railroad crossing. Additionally, the plaintiffs contend that even if a charge on the sudden emergency defense was appropriate, the charge as given was an incomplete statement of the law because it omitted a portion of the pattern jury charge on sudden emergency. We discern no reversible error because the plaintiffs failed to raise these specific objections to the charge in the court below, and they have failed to show that the alleged defects in the charge rose to the level of substantial error.

OCGA § 5-5-24 (a) provides that in civil cases, "no party may complain of the giving or the failure to give an instruction to the jury unless he objects thereto before the jury returns its verdict, stating distinctly the matter to which he objects and the grounds of his objection." "To be considered sufficient under this code section, an

14

objection must be 'stated distinctly enough for a 'reasonable' trial judge to understand its nature, enabling him to rule intelligently on the specific point.'" *Walker v. Mitchell*, 174 Ga. App. 738, 739 (2) (331 SE2d 82) (1985), quoting *Christiansen v. Robertson*, 237 Ga. 711, 712 (229 SE2d 472) (1976).

> The obvious purpose of this provision is to afford the trial court an opportunity to correct the charge which has been given, and to consider the grounds of an objection at a time before the jury has retired to consider its verdict and at a time when corrections can be made in the charge if upon such consideration the court deems a correction proper.

(Citation omitted.) *McDowell v. Hartzog*, 292 Ga. 300, 301 (736 SE2d 395) (2013).

Based on the same rationale, review of an objection to a jury charge on appeal is "limited strictly to the ground of objection stated . . . [at] trial." (Citation and punctuation omitted.) *Kent v. Henson*, 174 Ga. App. 400, 403 (2) (330 SE2d 126) (1985). See *Goodyear Tire & Rubber Co. v. Johnson*, 120 Ga. App. 395, 397-398 (3) (170 SE2d 869) (1969). Thus, in reviewing a jury charge pursuant to OCGA § 5-5-24 (a), we will not consider challenges to the charge on appeal that are different from the objections that were raised in the court below. See *Tucker Nursing Center v. Mosby*, 303 Ga. App. 80, 87 (5) (692 SE2d 727) (2010); *Georgia Ports Auth. v. Hutchinson*, 209 Ga. App. 726, 729 (7) (434 SE2d 791) (1993); *Shennett v. Piggly Wiggly*

15

*Southern*, 197 Ga. App. 502, 505 (399 SE2d 476) (1990) (on motion for rehearing); *Walker v. Mitchell*, 174 Ga. App. 738, 738 (2) (331 SE2d 82) (1985).

Here, the plaintiffs did not object to the trial court's charge on the sudden emergency defense on the ground that the defense was preempted by federal law or on the ground that the charge as given was an incomplete statement of the law because it omitted a portion of the pattern jury charge. Rather, the plaintiffs objected to the charge solely on the grounds that the evidence did not support a charge on sudden emergency and that the charge granted "immunity" to Norfolk Southern. Because the trial court was never afforded an opportunity to rule on the specific objections now raised by the plaintiffs on appeal, the plaintiffs' challenge to the charge on those grounds has been waived for purposes of appellate review under OCGA § 5-5-24 (a). See *Tucker Nursing Center*, 303 Ga. App. at 87 (5); *Hutchinson*, 209 Ga. App. at 729 (7); *Shennett*, 197 Ga. App. at 505; *Walker*, 174 Ga. App. at 738 (2).

Nevertheless, even if a challenge to a jury charge has been waived under OCGA § 5-5-24 (a), a trial court's charge can constitute reversible error under the exception set forth in OCGA § 5-5-24 (c). Subsection (c) of the statute provides that "[n]otwithstanding any other provision of . . . [OCGA § 5-5-24], the appellate courts

16

shall consider and review erroneous charges where there has been a substantial error in the charge which was harmful as a matter of law, regardless of whether objection was made hereunder or not." Instances of reversal under subsection (c) are "very rare." (Citations and punctuation omitted.) *Waller v. Rymer*, 293 Ga. App. 833, 836 (1) (668 SE2d 470) (2008). A charge constituting substantial error harmful as a matter of law "is one that is blatantly apparent and prejudicial to the extent that it raises the question of whether the losing party has, to some extent at least, been deprived of a fair trial because of it, or a gross injustice is about to result or has resulted directly attributable to the alleged errors." (Citation and punctuation omitted.) *Shilliday v. Dunaway*, 220 Ga. App. 406, 411 (8) (469 SE2d 485) (1996).

Even assuming arguendo that there was error in the giving of the sudden emergency charge, we conclude that it did not rise to the level of substantial error harmful as a matter of law. In addition to raising the defense of sudden emergency, Norfolk Southern presented evidence and argued to the jury that the motor vehicle accident resulting from the negligence of the drivers of the pickup truck and van proximately caused Lungaro's death, rather than the actions of the locomotive engineer. Norfolk Southern also presented evidence and argued to the jury that any additional blowing of the horn by the engineer would not have changed the outcome,

given that Lungaro was visibly dazed from the severe impact of the motor vehicle accident, and multiple other warning signals did not cause him to flee from the tracks. The jury thereafter returned a special verdict on the negligence per se and ordinary negligence claims expressly finding that the plaintiffs had not proven by a preponderance of the evidence that Norfolk Southern "violated 49 CFR § 222.21 and that such violation was a proximate cause of Tony Lungaro's death," and that the plaintiffs had not proven by a preponderance of the evidence that Norfolk Southern "was in any other way negligent and that such negligence was a proximate cause of the injuries to . . . [Lungaro]."

Under these circumstances, and particularly in light of the special verdict, we cannot say that the trial court's charge on the sudden emergency defense was so erroneous and prejudicial as to deprive the plaintiffs of a fair trial or result in a gross miscarriage of justice. There is simply no indication from the record before us that the jury's verdict in favor of Norfolk Southern was based on the sudden emergency defense rather than the competing defense theory of lack of proximate cause, and the plaintiffs therefore cannot show that they were harmed by any alleged error in the sudden emergency charge.

"Any charge which is not necessarily harmful to the complaining party is not such substantial error as to require reversal of the case, in the absence of a proper [objection] to the charge." *Moon v. Kimberly*, 116 Ga. App. 74, 75 (2) (156 SE2d 414) (1967). Accordingly, any error in the sudden emergency charge was not of such magnitude as to constitute substantial error under OCGA § 5-5-24 (c). See *Nelson v. Miller*, 169 Ga. App. 403, 405 (312 SE2d 867) (1984) (any error in charging the jury on defense of accident did not rise to the level of substantial error, where "[t]he record disclose[d] no evidence that the jury's verdict in favor of . . . [defendant] was based on the accident theory rather than a theory of comparative negligence"). See also *Shilliday*, 220 Ga. App. at 411 (8) (even if trial court erred in charging jury on assumption of risk and sudden emergency, it did not constitute substantial error).

3. The plaintiffs also challenge a separate, introductory portion of the trial court's charge in which the court provided a general overview to the jury of the claims raised by the plaintiffs and the defenses raised by Norfolk Southern. According to the plaintiffs, this introductory portion of the charge also included an erroneous description of the sudden emergency defense asserted by Norfolk Southern, necessitating the grant of a new trial.

19

The plaintiffs did not object to the introductory portion of the charge in the trial court and thus have waived any challenge on appeal under OCGA § 5-5-24 (a). See *Adams v. Wright*, 162 Ga. App. 550, 552 (5) (293 SE2d 446) (1982). And the alleged defect in the charge did not rise to the level of substantial error under OCGA § 5-5-24 (c) for the same reasons discussed supra in Division 2. We therefore discern no basis for reversal.

*Judgment affirmed. Boggs and Rickman, JJ., concur*.