**FIRST DIVISION**
**BARNES, P. J.,**
**REESE, P. J. and COLVIN, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**February 22, 2021**

# In the Court of Appeals of Georgia

A20A1583. FASSNACHT v. MOLER.

BARNES, Presiding Judge.

This case arises out of a dispute over a family partnership and lake house that led to arbitration and then culminated in Matthew A. Fassnacht physically attacking his father, Eric Lee Moler. After the attack, Moler filed the present action against Fassnacht for assault and battery and punitive damages. A trial ensued, and the jury found in favor of Moler and awarded him $30,000 in compensatory damages and $375,000 in punitive damages. The trial court denied Fassnacht's motion for a new trial, leading to this appeal. Fassnacht contends on appeal that the trial court erred in its jury charge on punitive damages by misstating the burden of proof and legal standard for awarding such damages and by instructing the jury on matters relating to the statutory cap on punitive damages during the first phase of the bifurcated trial.

Fassnacht also argues that the trial court erred in admitting testimony by Moler regarding the validity of the arbitration award issued in the parties' underlying family partnership dispute. Lastly, Fassnacht maintains that the punitive damages award was grossly excessive and disproportionate under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and under Georgia law. For the reasons discussed more fully below, we reject Fassnacht's arguments and affirm.

Following a jury trial, we view the evidence in the light most favorable to the verdict. *Lindsey v. Turner*, 279 Ga. App. 595, 596 (1) (631 SE2d 789) (2006). So viewed, the evidence presented at trial showed that Moler has five children, including Fassnacht, the oldest child.[1] At the time of the physical attack at issue in this case, Moler was 59 years old and disabled, having previously undergone multiple back surgeries resulting in the placement of four rods to stabilize his spine. Fassnacht, his adult son, was a former college football defensive back and linebacker.

*The Family Partnership.* The physical attack arose out of a dispute between Moler and Fassnacht over a family partnership and lake house. In 1999, Moler and his former wife established the family partnership for estate planning purposes, and limited and general partnership interests were conveyed to Fassnacht and the other

---

[1] Fassnacht changed his last name from Moler.

four children (the "Partnership"). The Partnership was funded almost entirely with United Parcel Service stock, worth approximately $20 million, that was acquired by Moler during his career there before he retired as a result of his disability.

In 2004, the Partnership purchased a lake house at Lake Keowee, South Carolina (the "Lake House"). Moler placed the deed to the Lake House in his own name in an effort to obtain certain tax benefits. Moler lived at the Lake House for about a year and thereafter stayed there sporadically.

*The Arbitration Award.* The Partnership agreement included a provision requiring the arbitration of certain disputes arising between the parties. Fassnacht, a certified public accountant who managed a registered investment advisory firm, increasingly opposed Moler's activities associated with the Partnership. Ultimately, in 2011, Fassnacht filed an arbitration action, contending that Moler had breached his fiduciary duties as a partner through mismanagement and misuse of the Partnership's assets. Among other things, Fassnacht alleged that Moler had improperly titled the Lake House in his own name and had not reimbursed the Partnership for rent or operating expenses when he stayed there. Fassnacht asked the arbitration panel to order dissolution of the Partnership.

On July 31, 2012, the arbitration panel issued its award requiring the dissolution of the Partnership and the division of the Partnership's assets (the "Arbitration Award"). As part of the Arbitration Award, Moler was required to "immediately convey to the Partnership all of his right, title and interest" in the Lake House and was given 30 days to pay $50,000 to the Partnership for unpaid rent, other expenses, and interest. Additionally, the Arbitration Award appointed Fassnacht as the sole managing partner for purposes of carrying out the Award and dissolving and winding up the Partnership, stated that he "shall take whatever action is necessary or appropriate to cause fee simple insurable and marketable title" of the Lake House to be held by the Partnership, and provided that the Partnership "shall be dissolved within 45 days of this Award."

*The Restraining Order.* During the dispute over the family partnership, Moler and his other four adult children sought a temporary restraining order against Fassnacht in the Superior Court of Fulton County. In April 2012, the superior court entered a restraining order requiring Fassnacht to stay at least 200 yards away from his four siblings and from Moler, and requiring them to stay that same distance away from Fassnacht (the "Restraining Order").

*The Lake House Attack.* On August 5, 2012, a few days after issuance of the Arbitration Award and while the Restraining Order remained in effect, Moler went to the Lake House with his girlfriend and members of her family. While there, Moler planned to meet with a real estate attorney to convey title of the Lake House to the Partnership. Over the next several days, Moler packed up his personal belongings at the Lake House and made preparations to transfer the property to the Partnership.

On the evening of August 8, 2012, Moler and his girlfriend were babysitting his girlfriend's one-year-old granddaughter at the Lake House. After dinner, Fassnacht arrived there unannounced. When Fassnacht drove up to the Lake House, it was still daylight, the garage doors were open, such that the two vehicles in the garage were visible, and Moler's dog was running around outside. Fassnacht, armed with a taser, approached the front door.

Moler's girlfriend saw Fassnacht drive up to the Lake House and warned Moler. Moler went to the front door, cracked it open, and warned Fassnacht that he should not be there in light of the Restraining Order. Before Moler finished speaking, Fassnacht forced the front door open and pushed Moler backwards, causing him to hit his head on the steel banister railing and fall to the floor on his back. As he pushed Moler, Fassnacht screamed, "F*ck you. You're the one that can't be here. F*ck you.

Why did you fight the arbitration? F*ck you. Why did you spend all of this money on lawyers?" After Moler fell to the floor, Fassnacht jumped on top of him, and while straddling him, struck him in the face, chest, and chin with his fists. Fassnacht then grabbed Moler's head and began smashing it up and down on the wooden floor until Moler felt like he was about to lose consciousness. Fassnacht pulled the taser out of his pocket and said, "I am going to f*cking kill you," but he fumbled with the taser and dropped it on the floor.

Moler yelled for his girlfriend to call the police and told Fassnacht that his girlfriend and her one-year-old grandchild were also in the house. Fassnacht accused Moler of lying and began searching the Lake House for the others. However, by that point, Moler's girlfriend had fled from the Lake House with the one-year-old child. Because she left her cell phone at the Lake House, Moler's girlfriend ran to another house and asked the occupants to call the police, and they did so.

While Fassnacht was searching the Lake House, Moler retrieved a .22 rifle stored in a closet. After Fassnacht finished his search and returned through the foyer area, Moler, with the rifle in hand and pointed downward, told Fassnacht to leave. Fassnacht responded by charging at Moler and grabbing the barrel of the rifle. Fassnacht swung Moler around as Moler held onto the rifle, causing Moler to fall into

6

a chair, and Fassnacht then bit Moler in the hand, head-butted him several times in the forehead, and used the taser on his leg and at the base of his spine. As they struggled over the rifle, Moler was able to load a round into the chamber of the weapon, but Fassnacht yanked off the brass ammunition tube on the underside of the barrel, causing the remaining ammunition to spill to the floor. Fassnacht also tased Moler in the arm, which caused Moler to involuntarily pull the trigger of the rifle, discharging the chambered round into the floor.

The two men eventually separated and retreated to different areas of the room. Fassnacht was furious, cursed at Moler, and complained to Moler about how much money Fassnacht had spent on the arbitration. While berating Moler about the arbitration, Fassnacht twice approached Moler and struck him on the head with the brass ammunition tube from the rifle.

The police subsequently arrived at the scene, but Moler declined to press criminal charges against Fassnacht. Moler had lacerations on his scalp and face, swelling in his cheek, and abrasions on his back and ankle. Moler was bleeding badly from his head and from his bitten hand, and he had blood coming out of his ear. Moler's elbow also was swollen from the fall to the floor, he had a headache and was disoriented, he had trouble hearing and ringing in his right ear, and he had pain in his

face, elbow, legs, knee, back, and neck. Emergency medical technicians arrived at the scene and treated Moler's injuries, but Moler initially declined to be taken to the hospital. However, later that night, Moler's girlfriend drove him to the hospital emergency room. Moler was diagnosed with a concussion, traumatic bursitis of the elbow, and cervical strain, and he received multiple stitches in his hand to close the bite wound. Moler was bedridden for several days as a result of his concussion, and he continued to have ringing in his ears at the time of trial.

*The Present Lawsuit.* In August 2014, Moler brought the present action against Fassnacht in the Superior Court of DeKalb County, asserting a claim for assault and battery and seeking compensatory and punitive damages.[2] Fassnacht answered, denying liability, and asserted counterclaims against Moler for assault and battery and for attorney fees and interest. A jury trial ensued that was bifurcated into a first phase that addressed tort liability, the amount of compensatory damages, and liability for punitive damages, and a second phase that addressed the amount of punitive damages.

During the first phase, Moler, his girlfriend (now wife), and Fassnacht testified, after which the jury found in favor of Moler on his assault-and-battery claim, found

---

[2] Moler also asserted a claim for aggravated stalking but voluntarily dismissed that claim before trial.

8

against Fassnacht on his counterclaim, and awarded Moler $30,000 in compensatory damages. On the special verdict form, the jury also found by clear and convincing evidence that Fassnacht's actions showed willful misconduct, malice, wantonness, or the entire want of care that would raise the presumption of conscious indifference to consequences toward Moler. The jury further found by a preponderance of the evidence that Fassnacht acted with the specific intent to cause harm to Moler.

After the verdict in the first phase, the parties presented closing argument regarding punitive damages but no additional evidence. At the close of the second phase, the jury awarded Moler $375,000 in punitive damages against Fassnacht. The trial court entered judgment in favor of Moler in the amount of compensatory and punitive damages awarded by the jury and denied Fassnacht's motion for new trial.

1. Fassnacht contends that the trial court erred in its charge to the jury on punitive damages during the first phase of the trial. According to Fassnacht, the trial court failed in its initial charge to properly instruct the jury that a defendant can be held liable for punitive damages only if the plaintiff proves by clear and convincing evidence that the defendant engaged in willful misconduct, and he contends that the error was not properly cured by the court's two recharges on punitive damages. Fassnacht also maintains that the trial court erroneously charged the jury on matters

9

pertaining to the statutory punitive damages cap during the first phase of the trial, when those matters should have been reserved for the second phase.

"It is well established that a jury charge must be adjusted to the evidence, apt, and a correct statement of the applicable law." (Citation and punctuation omitted.) *Curry v. Dept. of Transp.*, 341 Ga. App. 482, 484 (801 SE2d 95) (2017). "When we review an allegedly erroneous jury charge, we apply a plain legal error standard of review." (Citation and punctuation omitted.) *Cannon v. Barnes*, 357 Ga. App. 228, 231 (3) (850 SE2d 436) (2020).

With respect to punitive damages, we have explained:

Under OCGA § 51-12-5.1 (b), punitive damages may be awarded only where it is established by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. That Code section further limits punitive damages to a maximum of $250,000 for any tort action, unless the trier of fact finds that the defendant acted, or failed to act, with the specific intent to cause harm.

(Citation and punctuation omitted.) *Quay v. Heritage Financial*, 274 Ga. App. 358, 360 (1) (617 SE2d 618) (2005). See OCGA § 51-12-5.1 (b), (f), (g).[3] Additionally, our Supreme Court has held that in cases where punitive damages are at issue, courts are required under OCGA § 51-12-5.1 to either bifurcate or trifurcate the trial proceedings. *Webster v. Boyett*, 269 Ga. 191, 193 (1) (496 SE2d 459) (1998). See OCGA § 51-12-5.1 (d);[4] *Bolden v. Ruppenthal*, 286 Ga. App. 800, 804 (3) (650 SE2d

---

[3] OCGA § 51-12-5.1 provides in part:
    (b) Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.
. . . .
    (f) In a tort case in which the cause of action does not arise from product liability, if it is found that the defendant acted, or failed to act, with the specific intent to cause harm, . . . there shall be no limitation regarding the amount which may be awarded as punitive damages against an active tort-feasor but such damages shall not be the liability of any defendant other than an active tort-feasor.
    (g) For any tort action not provided for by subsection . . . (f) of this Code section in which the trier of fact has determined that punitive damages are to be awarded, the amount which may be awarded in the case shall be limited to a maximum of $250,000.00.

[4] OCGA § 51-12-5.1 (d) provides in part:
    (1) . . . In any case in which punitive damages are claimed, the trier of fact shall first resolve from the evidence produced at trial whether an award of punitive damages shall be made. This finding shall be made specially through an appropriate form of verdict, along with the

11

331) (2007). Where, as here, the trial court adopts a bifurcated trial procedure, the jury is to determine "liability, the amount of compensatory damages, and liability for punitive damages in the first phase and the amount of punitive damages in the second phase." *Webster*, 269 Ga. at 193 (1).

In the present case, during the first phase of the trial, the trial court initially addressed punitive damages when explaining the special verdict form to the jury:

> Under the circumstances of the case, state whether you find by a preponderance of the evidence defendant, Matthew Fassnacht, acted with a specific intent to harm the plaintiff, Eric Moler. And your answer in that case would be yes or no. If your answer is yes, and that's been proven to you by a preponderance of the evidence, then it's the conclusion of this portion of trial. We'd have a separate hearing dealing with the issue of punitive damages. There would be no – there would be some evidence presented I suspect, but most of it will be argument made by counsel.

---

other required findings.

    (2) If it is found that punitive damages are to be awarded, the trial shall immediately be recommenced in order to receive such evidence as is relevant to a decision regarding what amount of damages will be sufficient to deter, penalize, or punish the defendant in light of the circumstances of the case. It shall then be the duty of the trier of fact to set the amount to be awarded according to subsection (e), (f), or (g) of this Code section, as applicable.

12

After the trial court completed its instructions and the jurors were sent to the jury room, Fassnacht objected that the jury needed to determine whether there was proof by clear and convincing evidence that he engaged in willful misconduct, which was the threshold determination necessary for imposing punitive damages under OCGA § 51-12-5.1 (b). Moler also requested that the trial court instruct the jury that it had to find by clear and convincing evidence that Fassnacht engaged in willful misconduct to award punitive damages. In response, the trial court recharged the jury:

> Please be seated. All right. I made an error on the jury form – verdict form. It has two places to do findings. First, do you find in favor of plaintiff against the defendant? Then award the plaintiff damages and that includes actual damages plus medical bills, and pain and suffering. Then it has a second question which is now going to be added dealing with the issue of punitive damages. And it reads: "We, the jury, in the Fassnacht case, wish to consider an award of punitive damages against the defendant, Matthew Fassnacht based upon the finding that he engaged in willful misconduct or that his conduct demonstrates an entire lack of care that raises the presumption of conscious indifference to the consequences of his action upon Eric Moler." Or, "We, the jury, in the above-styled case do not wish to consider an award of punitive damages against defendant, Matthew Fassnacht." Those are the alternatives for you. . . . So I want you to go back to the jury room. We'll be giving you the evidence momentarily and the verdict form, then you may begin your deliberations. Please step to the jury room.

13

After the recharge, the parties requested that the trial court again recharge the jury so as to further clarify the law of punitive damages. In response, the trial court recharged the jury on punitive damages, tracking the suggested pattern jury instructions for punitive damages and clear and convincing evidence:[5]

> Please be seated. Jury trials are complicated enough but when the lawyers are confused and the Judge gets confused, boy is that a hassle. So I've decided after consulting with counsel to recharge you on punitive damages. I know you're dealing with first of all the issue of preponderance of the evidence as to normal damage, that's like medical bills and pain and suffering. But this is a charge that you must deal with should you consider punitive damages. And I have a new verdict form which should clarify what you have to do in this case.

> And the charge goes as follows: In tort actions, there may be aggravating circumstances that may warrant the awarding or imposing of additional damages called punitive damages.

> Before you may award punitive damages, the plaintiff must prove that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the

---

[5] See Georgia Suggested Pattern Instructions, Vol. I: Civil Cases §§ 02.040 (Clear and Convincing Evidence), 66.700 (Punitive Liability), 66.701 (Clear and Convincing Evidence), 66.702 (Punitive Liability, continued), 66.711 (Intent to Harm; Acting with), 66.712 (Intent to Harm; Amplified).

14

presumption of conscious indifference to consequences. The plaintiff must prove the defendant's liable for punitive damage by a higher standard of proof – than proof for other damages and that is by clear and convincing evidence.

Clear and convincing evidence is defined as evidence that would cause the jury to firmly believe each essential element of the claim to a high degree of probability. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence but less than beyond a reasonable doubt.

If a plaintiff fails to prove by clear and convincing evidence that the defendant was guilty of willful misconduct, malice, fraud, wantonness, or oppression, or entire want of care that would raise the presumption of conscious indifference to the consequences, then you would not be authorized to award punitive damages.

Mere negligence, although amounting to gross negligence, will not alone authorize an award of punitive damages.

Punitive damages, when authorized, are awarded not as compensation to the plaintiff but solely to punish, penalize, or deter the defendant. In your verdict, you must specify whether you do or do not decide that the plaintiff should receive or impose punitive damages.

If you decide to award punitive damages, you should further specify whether you find the defendant acted with a specific intent to

cause harm. A party possesses specific intent to cause harm when that party desires to cause consequences of it's act or believe of the consequences are substantially certain to result from it.

Intent is always a question for the jury. It may be shown by direct and circumstantial evidence and it may be shown by direct or circumstantial evidence.

Intent is ordinarily ascertained from acts and conduct. You may not presume the defendant acted with a specific intent to harm. An intent may be shown in many ways provided you, the jury, find it existed from the evidence produced. The jury may find such intent or absence of it upon the consideration of words, conduct, demeanor, motive, and all the other circumstances connected with prior act.

And you may presume that a person of sound mind and discretion intends a natural and probably cause of consequences of his act. The evidence may or may not rebut this presumption.

The trial court then went over a new special verdict form that the jurors were to use in their deliberations. With respect to the portion of the form that addressed punitive damages, the trial court stated:

The new jury form reads as follows: . . . Under the circumstances of the case, party to liability for punitive damages. Under the circumstances of the case state whether you find by clear and convincing evidence that

defendant, Matthew Fassnacht's actions show willful misconduct, malice, wantonness, or an entire want of care that would raise the presumption of conscious indifference to consequences to the plaintiff. And it requires an answer of yes or no. If you decide to award or oppose punitive damages, state whether you find by the preponderance of the evidence that the defendant, Matthew Fassnacht, acted with a specific intent to cause harm to Eric Moler.

After the recharge, the jury continued its deliberations and thereafter returned the special verdict form, which contained the following two questions pertaining to punitive damages:

Under the circumstances of this case, state whether you find by clear and convincing evidence that Defendant, Matthew Fassnacht's actions showed willful misconduct, malice, wantonness, or an entire want of care that would raise the presumption of conscious indifference to consequences to Plaintiff, Eric Moler. __Yes __ No

If you decided to award/impose punitive damages, state whether you find by the preponderance of the evidence that the Defendant, Matthew Fassnacht acted with specific intent to cause harm to Eric Moler. __ Yes __ No

The jury checked "yes" to both of the punitive damages questions.

17

(a) We agree with Fassnacht that the trial court erred in its initial charge by failing to instruct the jury that a defendant can be held liable for punitive damages only if the plaintiff proves by clear and convincing evidence that the defendant engaged in willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. However,

> the trial court may correct errors in a charge by calling attention to the erroneous parts of the charge and giving the jury the correct rule. . . . A proper instruction on recharge may correct an improper instruction given in the original charge to the jury, where . . . the correct instruction given on recharge explains away the defect in the previous improper charge.

(Citation and punctuation omitted.) *Floyd v. State*, 277 Ga. App. 166, 167-168 (626 SE2d 149) (2006). An initial erroneous charge is cured where "the context clearly shows . . . a modification of the erroneous rule." *Grooms v. Grooms*, 141 Ga. 478, 480 (81 SE 210) (1914).

Here, the trial court's final recharge to the jury clarified that before punitive damages could be awarded, the plaintiff was required to prove by clear and convincing evidence that the defendant actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the

18

presumption of conscious indifference to consequences. The final recharge also defined clear and convincing evidence. Accordingly, although the trial court erred in its original charge on punitive damages, the final "recharge clarified the issue and corrected any error." (Citations and punctuation omitted.) *Butts v. State*, 250 Ga. App. 695, 697 (2) (552 SE2d 888) (2001). Additionally, the special verdict form required the jurors to make a specific finding on the question of clear and convincing evidence of willful misconduct, and "[a] preprinted verdict form is treated as part of the jury instructions which are read and considered as a whole in determining whether there is error." (Citation and punctuation omitted.) *Atkins v. State*, __ Ga. __ (3) (850 SE2d 103) (2020). While the fact that the trial court charged and then twice recharged the jury on punitive damages meant that the charges "may not [have been] as clear and precise as could be desired,"[6] jurors ultimately were instructed on the correct burden of proof and legal standard for making the threshold determination necessary for imposing punitive damages under OCGA § 51-12-5.1 (b) and made a specific finding to that effect. Consequently, we discern no ground for reversal. See *Butts*, 250 Ga. App. at 697 (2). See *Herrin v. State*, 229 Ga. App. 260, 262 (2) (493 SE2d 634) (1997) ("Where a charge as a whole substantially presents issues in such a way as is

---

[6] *Herrin v. State*, 229 Ga. App. 260, 262 (2) (493 SE2d 634) (1997).

19

not likely to confuse the jury even though a portion of the charge may not be as clear and precise as could be desired, a reviewing court will not disturb a verdict amply authorized by the evidence.").[7]

(b) Fassnacht further contends that the trial court erred by charging the jury on specific intent to cause harm during the first phase of the trial because matters relating to the statutory punitive damages cap should have been reserved for the second phase. Fassnacht, however, failed to object to the trial court's charge or recharges on this specific ground in the court below.

OCGA § 5-5-24 (a) provides that "in all civil cases, no party may complain of the giving or the failure to give an instruction to the jury unless he objects thereto before the jury returns its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

---

[7] Although Fassnacht contends that the effect of the two recharges was to place undue emphasis on the issue of punitive damages, the trial court was authorized to recharge the jury to correct the error in the original charge and remove any confusion arising out of that error, and "there is no evidence that the recharge[s] left the jury with any indication as to what the [trial] court believed the evidence to be." *Hall v. State*, 252 Ga. App. 187, 190 (2) (556 SE2d 166) (2001). There is no undue repetition of a jury instruction, where, as here, "the record plainly shows that the trial court made a mistake during the giving of that instruction, recognized the mistake, and expressly set out to correct the mistake by giving the charge in its correct form." *Guess v. State*, 264 Ga. 335, 338 (7) (443 SE2d 477) (1994).

20

The obvious purpose of this provision is to afford the trial court an opportunity to correct the charge which has been given, and to consider the grounds of an objection at a time before the jury has retired to consider its verdict and at a time when corrections can be made in the charge if upon such consideration the court deems a correction proper.

(Citation and punctuation omitted.) *McDowell v. Hartzog*, 292 Ga. 300, 301 (736 SE2d 395) (2013). "Thus, in reviewing a jury charge pursuant to OCGA § 5-5-24 (a), we will not consider challenges to the charge on appeal that are different from the objections that were raised in the court below." *Smith v. Norfolk S. Ry. Co.*, 337 Ga. App. 604, 611-612 (2) (788 SE2d 508) (2016). Consequently, because Fassnacht did not raise below the specific objection to the charge and recharges that he now seeks to raise on appeal, his challenge has been waived under OCGA § 5-5-24 (a). See id.

Nevertheless, even if an objection to a jury charge has been waived under OCGA § 5-5-24 (a), the charge can constitute reversible error under the exception found in OCGA § 5-5-24 (c). *Smith*, 337 Ga. App. at 612 (2). Subsection (c) of that statute provides: "Notwithstanding any other provision of this Code section, the appellate courts shall consider and review erroneous charges where there has been a substantial error in the charge which was harmful as a matter of law, regardless of whether objection was made hereunder or not."

21

Instances of reversal under subsection (c) are very rare. A charge constituting substantial error harmful as a matter of law is one that is blatantly apparent and prejudicial to the extent that it raises the question of whether the losing party has, to some extent at least, been deprived of a fair trial because of it, or a gross injustice is about to result or has resulted directly attributable to the alleged errors.

(Citations and punctuation omitted.) *Smith*, 337 Ga. App. at 612 (2).

Pretermitting whether the trial court erred in charging the jury on specific intent to cause harm under OCGA § 51-12-5.1 (f) during the first rather than second phase of the bifurcated trial, we conclude that it did not rise to the level of substantial error harmful as a matter of law. Fassnacht contends that including the specific intent charge in the first phase was confusing. But the trial court, in its final recharge and in the revised special verdict form, made clear that the jury was required to make a specific finding, as a threshold matter for awarding punitive damages, as to whether there was proof by clear and convincing evidence of willful misconduct by Fassnacht to support an award of punitive damages, and then make a *separate, specific finding* as to whether there was proof by a preponderance of the evidence that Fassnacht acted with the specific intent to harm Moler. The trial court also instructed the jury on the definition of preponderance of the evidence in its original charge and on the

22

definition of clear and convincing evidence in its final recharge, and jury instructions, including original charges and recharges, must be read as a whole. *Wall v. Hall*, 244 Ga. App. 61, 63 (1) (b) (534 SE2d 828) (2000). Under these circumstances, there is no indication that the inclusion of the specific intent charge in the first phase of the trial confused or misled the jury or had any affect on the verdict. Accordingly, we cannot say that the trial court's charge deprived Fassnacht of a fair trial or resulted in a gross injustice so as to require reversal under OCGA § 5-5-24 (c). See *Smith*, 337 Ga. App. at 612 (2). See also *Zambetti v. Cheeley Investments*, 343 Ga. App. 637, 644 (1) (b) (808 SE2d 41) (2017) ("Any charge which is not necessarily harmful to the complaining party is not such substantial error as to require reversal of the case, in the absence of a proper objection to the charge.") (citation and punctuation omitted). Accord *Endsley v. Geotechnical & Environmental Consultants*, 339 Ga. App. 663, 675 (1) (794 SE2d 174) (2016) (error regarding bifurcation of proceedings did not require reversal, where error was harmless).

2. During the first phase of the trial, Moler testified about the Arbitration Award. Among other things, Moler testified that his counsel told him that the Arbitration Award "was not valid until it was confirmed by the court." On appeal, Fassnacht contends that the trial court abused its discretion in admitting Moler's

testimony regarding whether the Arbitration Award needed to be confirmed to be valid. According to Fassnacht, Moler's testimony pertained to a legal issue that was not appropriate for witness testimony and misstated Georgia law regarding the confirmation of arbitration awards. Fassnacht maintains that the erroneous admission of Moler's testimony harmed him because it undermined Fassnacht's testimony that he went to the Lake House to begin effectuating the Arbitration Award and instead suggested that Fassnacht had no right to be there on the day of his confrontation with Moler.

Pretermitting whether the trial court abused its discretion in admitting Moler's testimony regarding confirmation of the Arbitration Award, we conclude that any such error was harmless and thus does not merit reversal. "The new Evidence Code continues Georgia's existing harmless error doctrine for erroneous evidentiary rulings. . . . The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Haskins v. Ga. Neurosurgical Institute*, 355 Ga. App. 781, 783 (2) (845 SE2d 770) (2020), quoting *Perez v. State*, 303 Ga. 188, 191 (2) (811 SE2d 331) (2018). See OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. . . ."). At trial, Moler testified

24

without objection that on the day of the physical altercation, he was still in the process of deciding whether to appeal the Arbitration Award, and that his understanding after speaking with counsel was that he had 30 days to file such an appeal. Hence, there was evidence introduced at trial without objection that the Arbitration Award was still subject to challenge through judicial review. Additionally, and most notably, there was evidence introduced at trial of the Restraining Order. Thus, separate and apart from Moler's testimony regarding whether the Arbitration Award was valid before confirmation, there was other evidence before the jury that the Arbitration Award still was subject to judicial challenge, and there was evidence that Fassnacht should not have entered the Lake House on the day in question in light of Moler's presence there. Consequently, we conclude that it is highly probable that any error in the admission of Moler's testimony regarding confirmation did not contribute to the verdict. See *Virger v. State*, 305 Ga. 281, 296 (8) (b) (824 SE2d 346) (2019) (any error in the admission of evidence was harmless because it was "largely cumulative" of other evidence unchallenged on appeal); *Harris v. Tatum*, 216 Ga. App. 607, 611 (2) (455 SE2d 124) (1995) (any error in admission of testimony was harmless, "[a]s substantially the same evidence was already before the jury without objection").

3. Lastly, Fassnacht contends that the punitive damages award was grossly excessive and disproportionate under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and under Georgia law. We disagree.

(a) *Due Process Clause.* "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition," and "[o]nly when an award can fairly be categorized as 'grossly excessive' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *BMW of North America v. Gore*, 517 U.S. 559, 568 (II) (116 SCt 1589, 134 LE2d 809) (1996). On appeal, we review a jury's punitive damages award for gross excessiveness under the Due Process Clause by considering three guideposts:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 418 (II) (123 SCt 1513, 155 LE2d 585) (2003). Our review in this context is de novo. *Cooper Indus.*

26

*v. Leatherman Tool Group*, 532 U.S. 424, 436 (II) (121 SCt 1678, 149 LE2d 674) (2001).

(i) *Reprehensibility.* "The most important indicium of the reasonableness of a punitive damage award [is] the degree of reprehensibility of the defendant's conduct." *Craig v. Holsey*, 264 Ga. App. 344, 348 (5) (a) (590 SE2d 742) (2003). See *BMW of North America*, 517 U.S. at 575 (III), n. 23 ("The flagrancy of the misconduct is thought to be the primary consideration in determining the amount of punitive damages.") (citation and punctuation omitted). In evaluating the reprehensibility of a defendant's conduct, we take into account the following factors:

> whether[ ] the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Automobile Ins. Co.*, 538 U.S. at 419 (III) (A).

Fassnacht's conduct was particularly reprehensible. Fassnacht, armed with a taser, chose to confront Moler, his disabled father, at the Lake House despite entry of the Restraining Order requiring him to remain 200 yards away from Moler. After

27

forcing his way into the Lake House, Fassnacht physically attacked Moler by pushing him to the ground, striking him with his fists, slamming his head into the floor, head-butting him in the forehead, tasing him, biting his hand, and striking him on the head with the brass ammunition tube from the rifle. As a result of the violent attack, Moler suffered pain and disorientation; had lacerations and abrasions on his scalp, cheek, back, and ankle; was diagnosed with a concussion, traumatic bursitis of the elbow, and cervical strain; received multiple stitches to close the bite wound; was bedridden for several days because of his concussion; and continued to have ringing in his ears at the time of trial. Hence, several of the aforementioned factors evincing reprehensibility are present in this case: Fassnacht caused physical harm; his conduct evinced an indifference to or a reckless disregard of the health or safety of Moler; and the harm was the result of intentional malice. Moreover, although the record is silent as to any previous incidents of violence committed by Fassnacht, it bears repeating that Fassnacht's conduct occurred in the context of a preexisting Restraining Order. Given the presence of these factors and the evidence summarized above, Fassnacht's behavior clearly "exhibited a high degree of reprehensibility." *Craig*, 264 Ga. App. at 348-349 (5) (a) (defendant's conduct, which resulted in physical harm and exhibited a reckless disregard for the safety of others, was highly reprehensible). See

*BMW of North America*, 517 U.S. at 575 (III) (indicating, as part of analysis of reprehensibility, that "crimes marked by violence or the threat of violence" are more serious and blameworthy than nonviolent crimes or negligence) (citation and punctuation omitted).

(ii) *Ratio.* "The second guidepost is the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." (Citation, punctuation, and emphasis omitted.) *Craig*, 264 Ga. App. at 349 (5) (b). While the United States Supreme Court has recognized that the ratio of compensatory to punitive damages is a factor to take into account when evaluating whether a punitive damages award is excessive, the Court has explained that "[w]e need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that a general concern of reasonableness properly enters into the constitutional calculus." (Citation and punctuation omitted.) *BMW of North America*, 517 U.S. at 582-583 (III). "It is not enough, as some have suggested, 'to do the math'; we must also do the reasoning." *Time Warner Entertainment Co. v. Six Flags Over Ga.*, 254 Ga. App. 598, 607 (3) (b) (ii) (563 SE2d 178) (2002). "The punitive damages award must be viewed in its unique context, in light of the facts of the case and with

reference to the actual damages awarded and the potential harm that could have resulted from the defendant's conduct." Id. at 606 (3) (b) (ii), n. 9.

Here, the ratio of punitive damages to compensatory damages is 12.5 to 1. It is true that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, *to a significant degree*, will satisfy due process." (Emphasis supplied.) *State Farm Mut. Automobile Ins. Co.*, 538 U.S. at 425 (III) (B). But the ratio in the present case did not greatly exceed a single-digit ratio, and as previously noted, Fassnacht's intentional misconduct was particularly egregious and resulted in Moler suffering physical injury and ongoing hearing problems. Furthermore, given the volatile nature of the encounter and Fassnacht's rage directed at Moler, the situation had the potential of resulting in far greater physical harm to Moler, had the police not arrived at the scene when they did. Under these circumstances, we cannot say that the disparity between punitive and compensatory damages was so great as to cause a due process violation. See *Craig*, 264 Ga. App. at 349 (5) (b) (upholding ratio of punitive to compensatory damages of 22.7 to 1, where the plaintiff was physically injured in an accident caused by a defendant driver who was under the influence of drugs and alcohol, and the plaintiff could have suffered far great injury, even death, as a result of the accident); *Southeastern*

30

*Security Ins. Co. v. Hotle*, 222 Ga. App. 161, 165 (1) (e) (473 SE2d 256) (1996) (no due process violation where jury awarded $1 in general damages and $45,000 in punitive damages against defendant company, where plaintiff was subjected to degrading and reprehensible sexual harassment).

(iii) *Sanctions for Comparable Misconduct.* "Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third [guidepost] of excessiveness." *BMW of North America*, 517 U.S. at 583 (III). Based on the evidence in this case, if criminal charges had been pursued, Fassnacht could have faced prosecution for, among other things, family violence aggravated battery, which carried a sentence of imprisonment of between 3 and 20 years. See OCGA § 16-5-24 (a), (h) (2012);[8] *Levin v. State*, 334 Ga. App. 71,

_____

[8] OCGA § 16-5-24 (a) and (f) provide:

(a) A person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof.

. . . .

(h) If the offense of aggravated battery is committed between past or present spouses, persons who are parents of the same child, parents and children, stepparents and stepchildren, foster parents and foster children, or other persons excluding siblings living or formerly living in the same household, the defendant shall be punished by imprisonment for not less than three nor more than 20 years.

74 (1) (778 SE2d 238) (2015) (jury authorized to find defendant guilty of aggravated battery based on serious disfigurement, where beaten victim had a "bruised and swollen face, with one eye swollen shut, and a 'goose egg' on her face," as well as "bruised and swollen" hands and cut feet); *Biggins v. State*, 299 Ga. App. 554, 556 (1) (683 SE2d 96) (2009) (jury authorized to find defendant guilty of aggravated battery based on rendering member of body useless, where victim suffered damage to ear as a result of attack). Given the serious criminal sanctions that Fassnacht could have faced, we cannot say that the jury overstepped in the amount of punitive damages it awarded to Moler. See *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23 (3) (111 SCt 1032, 113 LE2d 1) (1991) (noting, in upholding award of punitive damages, that "[i]mprisonment . . . could also be required of an individual in the criminal context" under the facts of the case); *Aldworth Co. v. England*, 276 Ga. App. 31, 37 (3) (b) (iii) (622 SE2d 367) (2005) (taking into account that defendant could have been prosecuted and imprisoned for battery in deciding that punitive damages award was not excessive), reversed in part on other grounds, *Aldworth Co. v. England*, 281 Ga. 197 (637 SE2d 198) (2006).

For these reasons, we conclude that the punitive damages awarded to Moler in this case did not violate the Due Process Clause.

(b) *Georgia Law.* Fassnacht also contends that the punitive damages award was excessive under Georgia law.

"In Georgia, the purpose of punitive damages is to deter the repetition of reprehensible conduct by the defendant." *Ga. Clinic v. Stout*, 323 Ga. App. 487, 494 (4) (747 SE2d 83) (2013). See OCGA § 51-12-5.1 (c) ("Punitive damages shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant."). "Because deterrence is based on factors other than the actual harm caused, [Georgia appellate courts have] rejected the notion that punitive damages must necessarily bear some relationship to the actual damages awarded by the jury. Instead, the appellate courts look to see whether the award shocks the judicial conscience." (Citations and punctuation omitted.) *Time Warner Entertainment Co.*, 254 Ga. App. at 603-604 (2) (b). See *Hosp. Auth. of Gwinnett County v. Jones*, 261 Ga. 613, 614 (1) (409 SE2d 501) (1991); *Bearoff v. Craton*, 350 Ga. App. 826, 845 (7) (830 SE2d 362) (2019); *Ga. Clinic*, 323 Ga. App. at 494 (4). "Before the verdict will be set aside on the ground that it is excessive, where there is no direct proof of prejudice or bias, the amount thereof, when considered in connection with all the facts, must shock the moral sense, appear exorbitant, flagrantly outrageous, and extravagant. It must carry its death warrant upon its face." *Time Warner*

*Entertainment Co.*, 254 Ga. App. at 604 (2) (b). See *Bearoff*, 350 Ga. App. at 845-846 (7). "Although we do not mechanically look to the ratio between general and punitive damages to resolve the question of excessiveness, that ratio is some evidence of whether the jury's award was infected by undue prejudice or bias." *Ga. Clinic*, 323 Ga. App. at 494 (4).

"Questions concerning the amount of punitive damages to be awarded are for the enlightened conscience of the jury." (Citation and punctuation omitted.) *Norton v. Holcomb*, 299 Ga. App. 207, 211 (3) (682 SE2d 336) (2009). See *Reheis v. Baxley Creosoting & Osmose Wood Preserving Co.*, 268 Ga. App. 256, 262 (2) (601 SE2d 781) (2004). "Moreover, because the trial court approved the verdict in denying [Fassnacht's] post-trial motion, a presumption of correctness arises that will not be disturbed absent compelling evidence." (Citation and punctuation omitted.) *Norton*, 299 Ga. App. at 211-212 (3). And we "defer to the jury's factual decision-making process and . . . apply an abuse of discretion standard when evaluating whether [a punitive damages] award is excessive under the common law." *Time Warner Entertainment Co.*, 254 Ga. App. at 603 (2) (a) (ii).

Here, there is no direct proof of prejudice or bias infecting the punitive damages award, and in light of the evidence discussed supra in Division 3 (a), the

amount of punitive damages, when considered in connection with all the facts, does not shock the moral sense and does not appear exorbitant, flagrantly outrageous, and extravagant. Accordingly, the trial court did not abuse its discretion in denying Fassnacht's motion for new trial on this ground. See *Bearoff*, 350 Ga. App. at 846-847 (7) (upholding punitive damages award where jury awarded $2,000 in nominal damages and $50,000 in punitive damages, where defendants, among other things, deliberately breached promissory note and non-compete contract, violated bankruptcy court order, converted cash collateral, and engaged in behavior aimed at harassing and intimidating the plaintiff); *Lawrence v. Direct Mtg. Lenders Corp.*, 254 Ga. App. 672, 675 (3) (563 SE2d 533) (2002) (upholding punitive damages award where ratio of punitive to compensatory damages was 33.3. to 1 in case involving conversion and intentional misrepresentation and concealment); *King v. Towns*, 102 Ga. App. 895, 904 (5) (118 SE2d 121) (1960) (upholding punitive damages award where ratio of punitive to compensatory damages was 12.9 to 1 in case involving an intentional fraudulent scheme).

*Judgment affirmed. Reese, P. J., and Colvin, J., concur.*